41 F.3d 584
 10 IER Cases 102
 Dr. Rodrigo RAMIREZ and Barbara Snow, Plaintiffs-Appellants,
v.
OKLAHOMA DEPARTMENT OF MENTAL HEALTH, Daniel Clute, Gerald
D. Goodner, Woodrow Pendergrass, Nancey Prigmore,
and Bob LeFlore, Defendants-Appellees.
 No. 92-5105.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 28, 1994.
 
 Gary L. Richardson, Gregory G. Meier, and Dana C. Bowen of Richardson, Meier & Stoops, Tulsa, OK, for plaintiffs-appellants.
 David W. Lee, Oklahoma City, OK, for defendants-appellees.
 Before BALDOCK, HOLLOWAY, and BRORBY, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 Plaintiffs/appellants Dr. Rodrigo Ramirez (Ramirez) and Barbara Snow (Snow) appeal the district court's dismissal pursuant to Fed.R.Civ.P. 12(b)(6) of their complaint brought pursuant to 42 U.S.C. Secs. 1983, 1985 and 1988, and Oklahoma common law. Their suit complained of disciplinary actions taken against them as employees of the Oklahoma Department of Mental Health (DMH) who worked at the Eastern State Hospital (ESH). The district judge held all of plaintiffs' federal claims barred by absolute and/or qualified immunity, or Eleventh Amendment immunity. He therefore held that there is no supplemental jurisdiction under 28 U.S.C. Sec. 1367 for plaintiffs' state common law claim. We affirm in part, reverse in part, and remand.
 
 
 2
 * We have stated clearly the guiding principles that apply for our decisional process:
 
 
 3
 "The sufficiency of a complaint is a question of law which we review de novo." Morgan v. City of Rawlins, 792 F.2d 975, 978 (10th Cir.1986). A court may dismiss a complaint for failure to state a claim only if it concludes that "the plaintiff can prove no set of facts in support of his claim to entitle him to relief." Id. Furthermore, for purposes of making the foregoing determination, a court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff. Meade v. Grubbs, 841 F.2d 1512, 1526 (10th Cir.1988).
 
 
 4
 Williams v. Meese, 926 F.2d 994, 997 (10th Cir.1991). Moreover, granting such a motion to dismiss is "a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." Morgan, 792 F.2d at 978. In accordance with these principles, we must accept at this stage the following facts which the complaint avers:
 
 
 5
 Plaintiffs Dr. Ramirez, a licensed psychiatrist, and Ms. Snow, a registered nurse, were employed at the ESH of the Oklahoma DMH in March 1991. They were members of a treatment team at ESH, along with a registered psychologist, Peggy Rhinehart, and Lucille Barrett, a licensed social worker. Dr. Ramirez was the treatment team coordinator.
 
 
 6
 On March 11, 1991, Dr. Ramirez and Ms. Snow and the other team members were on duty at the hospital. An upset mental patient came to the team and complained that a mental health aide, defendant Clute, had handled her roughly and had grabbed her tightly by the upper arm, digging his fingernails into her flesh, causing contusions and scratches. App. A at 4. Dr. Ramirez examined the patient and noted the contusions and abrasions on her arm. Id. It was known to Dr. Ramirez and Ms. Snow and others that Clute was HIV positive and that the mental patient was thus at risk of infection from Clute with the communicable and fatal disease, through the HIV virus, known as Acquired Immune Deficiency Syndrome, AIDS. Id. The treatment team discussed the implications of the incident and their legal and ethical responsibilities to the mental patient. The team collectively concluded that a report in the form of a patient grievance should be made to their superiors in the DMH. The team, including Dr. Ramirez and Ms. Snow, prepared and filed a grievance on behalf of the mental patient. Id. at 4-5.
 
 
 7
 On April 26, 1991, Dr. Ramirez and Ms. Snow, together with team members Rhinehart and Barrett, received notices of proposed adverse personnel actions against them (five-day suspensions without pay) for: (1) failure to obey DMH policies respecting discriminatory actions against AIDS-infected individuals; and (2) misconduct because the team used the wrong form in reporting the alleged abuse of the patient. Thereafter Ms. Snow received a five-day suspension, notwithstanding her administrative grievances and appeals, and was transferred to a lesser position in the hospital, thereby depriving her of her seniority and ability to gain promotion. Id. at 5.
 
 
 8
 During the administrative procedure, defendant Prigmore, counsel for the hospital, informed the hearing officer, defendant LeFlore, that no threat of suit was made against the DMH or the hospital arising out of Dr. Ramirez and Ms. Snow's actions when in fact an agreement had been reached between Clute and Prigmore that Dr. Ramirez, Ms. Snow and team members Rhinehart and Barrett would be disciplined in exchange for Clute's forebearance of suit against the DMH and the hospital. Id. at 5-16.
 
 
 9
 Thereafter Dr. Ramirez, who as a "classified" employee was without benefit of administrative remedies by statute, was terminated ostensibly for the quality of his performance. But he was actually terminated for his involvement in the reporting of Clute's alleged abuse of the mental patient. Id. at 6, p 17.
 
 
 10
 Plaintiffs brought suit in August 1991 against DMH, Clute, Gerald Goodner (the acting superintendent at ESH), Woodrow Pendergrass and Nancey Prigmore (legal counsel for DMH), and Bob LeFlore (a director of DMH). The complaint alleged that DMH, acting under color of law and through its custom, practice, policy and decision, wrongfully terminated Dr. Ramirez's employment and adversely acted against Ms. Snow's employment. Defendant's substantial motivating factor in its decision to act against the plaintiffs allegedly was to retaliate against them for having exercised their legal right, obligation and protected free speech associated therewith, to report an incident involving the abuse and possibly lethal infection of a mental patient by a co-employee. Id. at 6, p 18.
 
 
 11
 It was averred further that defendants Clute, Prigmore, Goodner, LeFlore, Pendergrass and others unknown, conspired to violate the plaintiffs' right to free speech under color of law. It was the unlawful object of the conspiracy to retaliate against the plaintiffs by causing DMH to discharge Dr. Ramirez and discipline Ms. Snow for reporting the incident involving the abuse and possible lethal infection of a mental patient by a co-employee. Id. at 6-7, p 19. The complaint charges that "Defendants Clute, Prigmore, Goodner, LeFlore, and Pendergrass, and others presently unknown, did sponsor and promote the spurious personnel actions against the Plaintiffs, under color of law, and did, through misrepresentation of facts, cause the Defendant DMH to discharge Ramirez and discipline Snow." Id. at 7, p 20.
 
 
 12
 Both plaintiffs pray for damages, including punitive damages, costs, attorney's fees and interest. Dr. Ramirez also requests reinstatement, or in lieu thereof, front pay. Ms. Snow requests reinstatement to her former position. Id. at pp 23 and 24, and conclusion of the complaint.
 
 
 13
 In October 1991 defendants jointly moved to dismiss the complaint under Fed.R.Civ.P. 12(b) for failure to state a claim for relief and because the action is barred by the Eleventh Amendment. App. B. In their brief in support of their motion to dismiss, defendants argued that (1) defendants Clute, Goodner, Pendergrass, Prigmore and LeFlore are entitled to qualified immunity because the complaint fails to allege facts supporting its conclusory allegations; (2) defendants Goodner, Pendergrass, Prigmore and LeFlore are also entitled to absolute immunity as administrative attorneys or hearing officers; (3) DMH, as a state agency, is entitled to Eleventh Amendment immunity; and (4) the state law claims should be dismissed because plaintiffs failed to allege compliance with the notice requirement of the Oklahoma Governmental Torts Claims Act, and because pendent jurisdiction should not be exercised since the federal claims should be dismissed. Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint at 2-13, Appellants' Brief in Chief, App. C.
 
 
 14
 The district court granted defendants' motion to dismiss. The judge's order held that the plaintiffs' complaint made only insufficient conclusory allegations of violations of their First Amendment rights; thus the motion to dismiss on the ground of qualified immunity was granted. App. H at 4-5. He also ruled that defendants Goodner, Pendergrass, Prigmore and LeFlore were entitled to absolute immunity since their actions were taken while conducting administrative and judicial functions. The judge held further that the DMH should be dismissed as a state agency entitled to Eleventh Amendment immunity. Lastly, he held that because defendants are immune from suit under federal law, there was no supplemental jurisdiction for the state law claim. The complaint was dismissed and no leave to amend was granted.[1]
 
 II
 
 15
 * Eleventh Amendment Immunity
 
 
 16
 It is well-established that absent an unmistakable waiver by the state of its Eleventh Amendment immunity, or an unmistakable abrogation of such immunity by Congress, the amendment provides absolute immunity from suit in federal courts for states and their agencies. Atascadero State Hospital v. Scanlon, 473 U.S. 234, 241, 243, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985); Florida Dept. of Health and Rehabilitative Services v. Florida Nursing Home Ass'n, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981) (per curiam). Eleventh Amendment immunity applies "whether the relief sought is legal or equitable." Papasan v. Allain, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986). Absent a waiver by the state, or a valid congressional override, the amendment bars a damages action against a state in federal court. Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985). This bar remains in effect when state officials are sued for damages in their official capacity; this is so because a judgment against a public servant in his official capacity imposes liability on the entity that he represents. Id.
 
 
 17
 Here the district judge dismissed the complaint outright as to one defendant--DMH--on Eleventh Amendment grounds. Order, App. H at 5. The order did not limit the effect of that dismissal or distinguish between the plaintiffs' claims for damages for DMH's past actions and the claim for reinstatement. We hold that the Eleventh Amendment dismissal of DMH was proper as to the former claim, but was in error as to the latter.
 
 
 18
 The complaint alleges that the defendant DMH "is an agency of the State of Oklahoma." Id. at p 9. Oklahoma has not waived its Eleventh Amendment immunity. 51 O.S.1991 Sec. 152.1 B; cf. Nichols v. Dept. of Corrections, 631 P.2d 746, 749-51 (Okla.1981). Therefore as to the claim against DMH for damages for its past actions, and costs and fees related to that claim, the dismissal by the district court was not in error and that portion of the decision below is affirmed.
 
 
 19
 The complaint prays, however, for relief other than damages. Both Dr. Ramirez and Ms. Snow request "equitable relief of reinstatement to [their] former position...." Complaint, App. A at pp 23 and 24. Such injunctive relief which would govern only future action and would require reinstatement to remedy continuing violations of federal law is within an exception to the bar of the Eleventh Amendment. Russell v. Dunston, 896 F.2d 664, 667-68 (2d Cir.), cert. denied, 498 U.S. 813, 111 S.Ct. 50, 112 L.Ed.2d 26 (1990); Coakley v. Welch, 877 F.2d 304, 306-07 (4th Cir.), cert. denied, 493 U.S. 976, 110 S.Ct. 501, 107 L.Ed.2d 503 (1989); see Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974).
 
 
 20
 Thus dismissal as to DMH on Eleventh Amendment grounds with respect to the plaintiffs' claim for reinstatement was in error and the order of dismissal is reversed in that respect. The claim for reinstatement will be remanded for further proceedings.
 
 B
 
 21
 Absolute Immunity of Pendergrass, Prigmore, Goodner and LeFlore
 
 
 22
 The district court also dismissed plaintiffs' claims against counsel for DMH (Pendergrass and Prigmore) and the hearing officers assigned to the disciplinary and personnel actions in this case (Goodner and LeFlore) on the ground of absolute immunity. In so holding, the court relied primarily on Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).[2]
 
 1.
 Butz v. Economou
 
 23
 In Butz the Court extended absolute immunity to certain federal administrative hearing examiners, agency officials, and agency attorneys involved in agency adjudication proceedings. Id. at 515-17, 98 S.Ct. at 2915-16. The Court reasoned that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." Id. at 512-13, 98 S.Ct. at 2913-14. In particular, the Court stressed that federal agency adjudication is characterized by the same degree of procedural integrity and independence as the judicial process, and "[b]ecause these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is less pressing need for individual suits to correct constitutional error." Id. at 512, 98 S.Ct. at 2913. The Court elaborated:
 
 
 24
 The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process....
 
 
 25
 [T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. [Footnote omitted.] Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is less pressing need for individual suits to correct constitutional error.
 
 
 26
 Id. at 512, 98 S.Ct. at 2913.
 
 
 27
 The Court emphasized the importance of the Administrative Procedure Act in insuring that agency adjudication provides procedural integrity and safeguards comparable to those of the judicial process:
 
 
 28
 [F]ederal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversary in nature. See 5 U.S.C. Sec. 555(b) (1976 ed.). They are conducted before a trier of fact insulated from political influence. See Sec. 554(d). A party is entitled to present his case by oral or documentary evidence, Sec. 556(d), and the transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision. Sec. 556(e). The parties are entitled to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record. Sec. 557(c).
 
 
 29
 Id. at 513, 98 S.Ct. at 2914.
 
 
 30
 As to the role performed by the defendant hearing examiners in the agency adjudication proceedings, the Court concluded that it was " 'functionally comparable' to that of a judge" and therefore deserving of immunity. Id. at 513, 98 S.Ct. at 2914. The Court held that "persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts." Id.
 
 
 31
 Similarly, as to federal agency attorneys involved in the agency adjudication process, the Court found no substantial difference between these and "prosecutor[s] who bring[ ] evidence before the court." Id. at 516, 98 S.Ct. at 2916. In either case, "the evidence [presented by the attorneys] will be subject to attack through cross-examination, rebuttal or reinterpretation by opposing counsel" as well as ultimate adjudication by "an impartial trier of fact." Id. at 517, 98 S.Ct. at 2916.
 
 2.
 Cleavinger v. Saxner
 
 32
 Since Butz the Court has made it clear that application of judicial immunity outside the traditional judicial context is premised upon the existence of procedural guarantees and safeguards comparable to those found in federal administrative adjudication proceedings. In Cleavinger v. Saxner, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), the Court refused to extend absolute judicial immunity to members of a prison discipline committee responsible for hearing cases involving inmates charged with prison rules infractions. Citing Butz, the Court reaffirmed its "functional approach" to absolute immunity, stressing that such immunity "flows not from rank or title or 'location within the Government,' ... but from the nature of the responsibilities of the individual official." Id. at 201, 106 S.Ct. at 500 (citation omitted).
 
 
 33
 While recognizing that "[t]he [prison] committee members, in a sense, do perform an adjudicatory function", the Court "d[id] not perceive the discipline committee's function as a 'classic' adjudicatory one...." Id. at 203, 106 S.Ct. at 502. The Court stressed two principal factors precluding application of judicial immunity. First, the Court pointed out that the defendant committee members did not appear to possess the kind of independence that characterized the defendants in Butz:
 
 
 34
 [T]he members of the committee, unlike a federal or state judge, are not "independent"; to say that they are is to ignore reality. They are not professional hearing officers, as are administrative law judges. They are, instead, prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties.... They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee.... It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance.
 
 
 35
 Id. at 203-04, 106 S.Ct. at 501-02 (citations omitted).[3]
 
 
 36
 Second, the Court distinguished Butz based on the absence of APA-like procedural safeguards in connection with the prison disciplinary proceedings:
 
 
 37
 Under the [Prison] Bureau's disciplinary policy in effect at the time of respondents' hearings, few of the procedural safeguards contained in the Administrative Procedure Act under consideration in Butz were present. The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.
 
 
 38
 474 U.S. at 206, 106 S.Ct. at 503.[4] See also Howard v. Suskie, 26 F.3d 84, 86 (8th Cir.1994) (no absolute immunity absent adjudicatory safeguards spelled out in Cleavinger); Krueger v. Lyng, 4 F.3d 653, 656-57 (8th Cir.1993) (same).
 
 3.
 Application of Butz and Cleavinger
 
 39
 The combined teaching of Butz and Cleavinger compels us to conclude that absolute immunity does not, as a matter of law, apply to plaintiffs' claims against the individual defendants on the present record. Considering the circumstances alleged in the complaint, we are unable to say with certainty that "adjudication within [the DMH disciplinary system] shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." Butz, 438 U.S. at 512-13, 98 S.Ct. at 2913-14. The complaint contains several allegations, which we must accept as true at this juncture, casting doubt on the procedural safeguards of the disciplinary procedures employed in this case.
 
 
 40
 With respect to the nature and quality of the disciplinary proceedings against Ramirez, the complaint alleges that he, because of his employee classification, was disciplined "without the benefit of administrative remedies by statute." Complaint, p 17.[5] The complaint further states that the hearing officer in charge of the proceedings against Dr. Ramirez (Goodner) concurrently served as the acting superintendent of ESH. Complaint, p 5. As to Ms. Snow, the complaint asserts that the hearing officer in charge of the proceedings against her (LeFlore) also served as a director of the DMH. Complaint, pp 5, 8.
 
 
 41
 The foregoing allegations indicate that the disciplinary proceedings against Dr. Ramirez lacked the kind of procedural safeguards discussed above. The allegations also indicate that the hearing officers in charge of the proceedings against both Dr. Ramirez and Ms. Snow appear to have been "officials ... temporarily diverted from their usual duties ... under obvious pressure to resolve a disciplinary dispute in favor of the institution." Cleavinger, 474 U.S. at 204, 106 S.Ct. at 502. The officers' concurrent roles as ESH superintendent and DMH director have an inherent tendency to undermine the objectivity and impartiality required for absolute immunity to apply. Their dual functions create "a relationship [between the officers and the disciplined employees] that hardly is conducive to a truly adjudicatory performance." Id. The danger of a lack of objectivity and impartiality on the part of these two hearing officers runs counter to the mandate of the Oklahoma Administrative Procedures Act that "[a] hearing examiner ... shall withdraw from any individual proceeding in which he cannot afford a fair and impartial hearing or consideration." 75 O.S.A. Sec. 316.
 
 
 42
 At this stage of the litigation, we do not feel that the DMH disciplinary proceedings have been shown to necessarily "share enough of the characteristics of the judicial process" that the defendants who participated in the proceedings "should also be immune from suits for damages." Butz, 438 U.S. at 512-13, 98 S.Ct. at 2913-14. "Given the sparing recognition of absolute immunity by both the Supreme Court and this court, one claiming such immunity must demonstrate clear entitlement." Robinson v. Volkswagenwerk AG, 940 F.2d 1369, 1370 (10th Cir.1991), cert. denied sub nom. Herzfeld & Rubin v. Robinson, --- U.S. ----, 112 S.Ct. 1160, 117 L.Ed.2d 408 (1992). Since no clear showing of entitlement to absolute immunity for Goodner, LeFlore, Pendergrass and Prigmore appears from the present record, the district court erred in dismissing the claims against these defendants on absolute immunity grounds. On remand, the defendants will be entitled to develop any further showing possible on their defense of absolute immunity.
 
 C
 
 43
 Qualified Immunity of Clute, Goodner, LeFlore, Pendergrass,
 
 
 44
 and Prigmore
 
 
 45
 The district court also dismissed the claims against all the individual defendants on the basis of qualified immunity. Order filed April 21, 1992 at 4-5, Appellants' Brief in Chief, App. H. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).
 
 
 46
 Because qualified immunity protects a defendant from both liability and suit, "prior to filing an affirmative defense, a defendant can challenge a complaint by filing either a motion to dismiss or a motion for summary judgment if the plaintiff has failed to come forward with facts or allegations that establish that the defendant has violated clearly established law." Sawyer v. County of Creek, 908 F.2d 663, 665 (10th Cir.1990). "When the defense of qualified immunity has been raised by the defendant, the plaintiff then has the burden to show with particularity facts and law establishing the inference that the defendants violated a constitutional right." Walter v. Morton, 33 F.3d 1240, 1242 (10th Cir.1994). Thus, "[u]nless and until the plaintiff both demonstrates a clearly established right and comes forward with the necessary factual allegations, the 'governmental official is properly spared the burden and expense of proceeding any further.' " Id. at 666 (quoting Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir.1989)).
 
 1.
 Clearly Established Right Analysis
 
 47
 Following the Harlow analysis on qualified immunity, we feel it clear that as to the first prong the defendants Goodner, LeFlore, Pendergrass and Prigmore were "government officials performing discretionary functions." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. As to defendant Clute, however, we see no basis for his satisfying the condition of being a government official exercising a discretionary function. Accordingly the dismissal as to Clute on the ground of qualified immunity was error and must be reversed. The dismissal on qualified immunity grounds with respect to defendants Goodner, LeFlore, Pendergrass and Prigmore still must be considered in light of the second Harlow prong--whether they violated "clearly established statutory or constitutional rights of which a reasonable person would have known...." Harlow, id. at 818, 102 S.Ct. at 2738. We turn now to this important question.
 
 
 48
 "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). In Frazier v. King, 873 F.2d 820 (5th Cir.1989), cert. denied sub nom. Davoli v. Frazier, 493 U.S. 977, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989), a nurse at a correctional facility had reported violations of nursing practices in the infirmary to her supervisor and other officials at the facility. She was fired and brought suit under Sec. 1983 claiming that her termination violated her First Amendment rights. The Fifth Circuit concluded that the quality of nursing care given to inmates is a matter of public concern, id. at 825, 102 S.Ct. at 2742, and held that Frazier had a clearly established First Amendment right to report violations of procedure. Id. at 827, 102 S.Ct. at 2743. "A reasonable official would know that it would be a violation of Frazier's rights to fire her after she blew the whistle on the improprieties at the prison." We agree with the Fifth Circuit and hold that Dr. Ramirez and Ms. Snow had a clearly established right to file a grievance on behalf of the patient endangered by Clute's alleged mistreatment.
 
 
 49
 As was the Fifth Circuit in Frazier, we are convinced that the quality of nursing care given to a patient involves a matter of public concern within the principles recognized in Connick v. Myers, 461 U.S. 138, 145-46, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), and Rankin v. McPherson, 483 U.S. at 383-84, 107 S.Ct. at 2896. The strong public policy of the state for protection of patients from abuse, and the concomitant duty of medical and nursing personnel to afford such protection, is recognized repeatedly in Oklahoma law. Criminal penalties are imposed on any officer or employee of any DMH hospital who shall maliciously assault, beat, batter, abuse, etc., or willfully aid, abet, advise or permit such mistreatment of patients. 43A O.S.A. Sec. 2-219. Moreover, a superintendent who shall fail to report to the district attorney of the county where his institution is located, any officer or employee who shall willfully or maliciously assault, beat, batter, abuse, etc., or who shall aid, abet, advise or permit any patient to be subjected to such conduct is made guilty of a misdemeanor. 43A O.S.A. Sec. 2-220.
 
 
 50
 In addition, the Oklahoma statutes mandate that all patients "at institutions within the Department shall be given humane care and treatment.... No severe physical or emotional punishment shall be inflicted, and the rules and discipline shall be designed to promote the well-being of the patients...." 43A O.S.A. Sec. 4-101. Moreover, the statutes require that any "physician, surgeon, ... or registered nurse, examining, attending, or treating the victim of what appears to be criminally injurious conduct as defined by Section 142.3 of Title 21 ... shall report orally or by telephone the matter promptly to the nearest appropriate law enforcement agency...." "Criminally injurious conduct" is defined in 21 O.S.A. Sec. 142.3(5), as "an act which occurs or is attempted in this state that results in personal injury or death to a victim which is punishable by fine, imprisonment or death."
 
 
 51
 We are persuaded that plaintiffs have shown a clearly established right. In light of the strong public policy expressed in the statutes for the protection of a patient, like the one endangered at ESH here, we feel it clear that Dr. Ramirez and Ms. Snow properly exercised their First Amendment right, consistent with their professional duty and ethics, to make the report they did in the form of the patient grievance.[6]
 
 2.
 Pickering Balancing
 
 52
 Our conclusion that Dr. Ramirez and Ms. Snow possessed a clearly established right to file the patient grievance does not end the inquiry. In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court noted that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the citizenry in general." Id. at 568, 88 S.Ct. at 1734. Thus, a public employer's legitimate needs and interests may justify some limitations on the speech of employees. "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. We must therefore balance the plaintiffs' First Amendment rights against the state's interest in promoting efficiency at the ESH.
 
 
 53
 To justify restricting employees' speech, defendants must show, inter alia, "actual disruption of services which results from the employee[s'] speech." Schalk v. Gallemore, 906 F.2d 491, 496 (10th Cir.1990) (citing Melton v. City of Oklahoma City, 879 F.2d 706, 715-16 (10th Cir.), reh'g granted, en banc, on other grounds, 888 F.2d 724 (1989), and on reh'g en banc, 928 F.2d 920 (1991), cert. denied, --- U.S. ----, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991)). And defendants must show that the disruption outweighs the First Amendment rights of the employees. See Pickering, supra. In Rankin v. McPherson, supra, the Court stated
 
 
 54
 In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. [citations omitted]. We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.
 
 
 55
 Id. at 388, 107 S.Ct. at 2899. In essence, the focus is "on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." Id.
 
 
 56
 In Frazier v. King, supra, the Fifth Circuit held that the defendants had failed to meet their burden of showing serious disruption justifying infringement on plaintiff's First Amendment rights to report violations of nursing practices at the infirmary. The defendants in Frazier asserted that the plaintiff had "disrupted the infirmary by (1) copying inmate records when she should have been helping patients; (2) creating 'an atmosphere of uncertainty among the other nurses;' and (3) failing to follow established grievance procedures." 873 F.2d at 826. Following the guidance of Rankin, the Fifth Circuit held that
 
 
 57
 The defendants do have a legitimate concern about the disruption caused by Frazier's accusations. Although Frazier's 'whistle blowing' obviously created tension and difficulties ... when weighed against the exposure of unethical medical practices affecting hundreds of inmates, the disruption is a minimal interest.... [I]t would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.
 
 
 58
 873 F.2d at 826 (internal quotation marks and citations omitted). Thus, the balance favored the plaintiff. Similar concerns are present in the case before us.
 
 
 59
 We are convinced that at this stage of the proceedings, defendants have not demonstrated that the state interest outweighs the plaintiffs' strong First Amendment interest in reporting possible patient abuse by staff members. Based on the allegations in the complaint, it is clear that defendants have not shown sufficient disruption so as to justify restricting the plaintiffs' rights to report possible incidents of abuse of the patients. Defendants retain the right to assert the qualified immunity defense throughout the proceedings, as the facts develop more fully.[7] See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1487 (11th Cir.1992) (also rejecting qualified immunity defense at motion to dismiss stage, but stressing defendants' right to assert qualified immunity defense in subsequent proceedings).
 
 
 60
 In sum, we conclude that at this stage of the proceedings, under the balancing test of Pickering the defendants have not shown that the state's interests outweigh the plaintiffs' First Amendment interests. On remand, defendants will be entitled to further develop a factual showing on interests of the state which they may assert as outweighing the plaintiffs' First Amendment rights.
 
 
 61
 We now must consider whether the complaint sufficiently alleges that the adverse actions were taken in retaliation for the plaintiffs' filing the patient grievance.
 
 3.
 The Claim of Retaliation
 
 62
 The district court concluded that plaintiffs' complaint fails to allege specific facts showing that defendants acted with a retaliatory motive in discharging and demoting plaintiffs, that their allegations were merely conclusory, and that the individual defendants are thus entitled to the defense of qualified immunity. We disagree.
 
 
 63
 While retaliatory motive is an element of plaintiffs' case here, Schalk v. Gallemore, 906 F.2d at 497 (citing Mount Healthy City School Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)), we do not agree that on their complaint "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). In the first place, "because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence." Smith v. Maschner, 899 F.2d 940, 949 (10th Cir.1990). As in Smith, a claim of such retaliation may be established by "the only means available ... circumstantial evidence." Id. at 949. Here the complaint clearly pointed to such circumstantial evidence. Dr. Ramirez and Ms. Snow alleged that the adverse actions against them, a dismissal and a demotion,[8] were instituted on April 26, 1991--just one month and a half after their submission of the grievance for the patient endangered by the HIV-infected employee. Layoffs which occurred less than two months after engaging in protected activity, along with knowledge that the plaintiffs had engaged in that activity, were held sufficiently probative of a retaliatory motive to withstand summary judgment in Miller v. Fairchild Industries, Inc., 797 F.2d 727, 731-32 (9th Cir.1986). See also Schwartzman v. Valenzuela, 846 F.2d 1209, 1212 (9th Cir.1988).
 
 
 64
 Further, plaintiffs allege here that "an agreement had been reached between Clute and ESH counsel Prigmore that [Dr. Ramirez, Ms. Snow, and treatment team members Rhinehart and Barrett] would be disciplined in exchange for Clute's forebearance of suit against the hospital and/or DMH." Complaint, p 16. If this allegation indicating improper motivation for the disciplinary action taken is established, it gives further support to plaintiffs' claims. Moreover, plaintiffs have identified the flimsy reasons given for the actions taken against them--alleged failure to obey policies barring discrimination against AIDS-infected individuals and use of the "wrong form" in making the patient's grievance. It is possible that a trier of fact could infer that these asserted reasons were pretextual.
 
 
 65
 In view of all the allegations made, we cannot agree that the complaint was properly dismissed. "Evidence on the motivating factor issue may be sufficient to support a jury verdict even though it is circumstantial." Ware v. Unified School Dist. 492, Butler County, Kansas, 881 F.2d 906, 911 (10th Cir.1989), modified in part, reh'g denied, en banc, 902 F.2d 815 (1990). In sum, proof of the underlying circumstances and the close temporal proximity between the exercise of plaintiffs' First Amendment rights and the actions taken against them could reasonably support an inference of an unlawful retaliatory action.
 
 III
 
 66
 The district court's dismissal on Eleventh Amendment grounds of plaintiffs' claims against DMH for damages for its past actions is AFFIRMED. The dismissal as to DMH of the plaintiffs' claims for reinstatement to their former positions is REVERSED. The court's dismissal of plaintiffs' claims against the individual defendants on absolute and qualified immunity grounds is REVERSED. The case is REMANDED for further proceedings consistent with this opinion.[9]
 
 
 
 *
 The parties have agreed that this case may be submitted for decision on the briefs. See Fed.R.App.P. 34(f); 10th Cir.R. 34.1.2. The case is therefore ordered submitted without oral argument
 
 
 [1]
 In Plaintiffs' Opposition to the Defendants' Motion to Dismiss Complaint, plaintiffs requested that "should [the district court] determine that Plaintiff has failed to state facts with sufficient particularity to place the Defendants on notice of the nature of the action brought against them, Plaintiffs would have this Court grant sufficient time in which Plaintiffs would be permitted to cure any specified defects within the pleadings." App. B at 2
 Also, Plaintiffs' Brief in Support of their Opposition to Defendants' Motion to Dismiss Complaint stated that plaintiffs "would have leave of Court to amend their complaint to cure any deficiencies if such deficiencies are hereinafter determined to exist by the Court." App. E at 12.
 
 
 [2]
 See Horwitz v. State Board of Med. Examiners of State of Colorado, 822 F.2d 1508, 1512-16 (10th Cir.) (discussing and analyzing Butz), cert. denied, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987)
 
 
 [3]
 The Court thus likened the defendants in Cleavinger to the school board members in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), whose role it was "to judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations" but who were found to be protected only by qualified immunity. Wood, 420 U.S. at 319, 95 S.Ct. at 999. The Court in Wood concluded that "absolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." Id. at 320, 95 S.Ct. at 1000
 
 
 [4]
 In the foregoing respects, Cleavinger is distinguishable from Shelly v. Johnson, 849 F.2d 228 (6th Cir.1988), where the Sixth Circuit extended absolute judicial immunity to a prison hearing officer and prison officials whose "adjudicatory functions are spelled out at length in [a] statute"; whose "duties with respect to testimony of witnesses and admission of evidence are delineated in detail"; who are "subject to disqualification at the request of an inmate upon a showing of bias or other valid reasons"; whose "decisions must be in writing and must include findings of fact and the underlying evidence"; and whose decisions are subject to "rehearings, as well as ... judicial review in the [state] courts." Id. at 230
 The hearing officer in Shelly was "an attorney especially appointed to conduct prison disciplinary hearings as a full time judicial officer, wholly independent of the warden and other prison officials ... [and] guided by strict statutory procedural rules...." Id. See also Watts v. Burkhart, 978 F.2d 269, 276 (6th Cir.1992) ("The presence of ... procedural safeguards and the independent status of the [hearing examiners] clearly distinguish this case from [Cleavinger].... [W]e are dealing with independent professionals who are required by law to provide substantial due process protection.").
 
 
 [5]
 Ms. Snow, on the other hand, was entitled to pursue administrative remedies and did so, albeit unsuccessfully. Complaint, pp 15-16. We assume that the administrative remedies referred to in the complaint are those provided under the Oklahoma Administrative Procedures Act, 75 O.S.A. Sec. 250, et seq
 
 
 [6]
 We have noted Schalk v. Gallemore, 906 F.2d 491 (10th Cir.1990), and Johnsen v. Independent School Dist. No. 3 of Tulsa County, 891 F.2d 1485 (10th Cir.1989). In Schalk, a hospital administrator was held entitled to qualified immunity in his personal capacity for discharge of a hospital employee. While the employee's letter complaining about waste, inefficiency and favoritism at the hospital was directed to matters of public concern, those subjects alone did not make the issue clear cut, and qualified immunity was available for the administrator. We feel that the subject matter in the Schalk case is not comparable to the facts here concerning abuse of a patient which Dr. Ramirez saw evidence of and which he and Ms. Snow realized could be life threatening
 Likewise, we feel that Johnsen is not analogous to the instant case. While we recognized that the nurse's remarks in Johnsen touched on a matter of public concern, we agreed that there was a showing of needless disruption of the school's health programs so that the speech was not constitutionally protected under the balancing test of Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
 We conclude, infra, Part II.C.3, that defendants in this case have made no showing of disruption. Thus, Johnsen is inapposite.
 
 
 [7]
 In Connick v. Myers, supra, the Court cautioned "that a stronger showing [of disruption] may be necessary if the employee's speech more substantially involved matters of public concern." 461 U.S. at 152, 103 S.Ct. at 1692. See also, Gonzales v. Benavides, 774 F.2d 1295, 1302 (5th Cir.1985) (same), cert. denied, 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986). We note that defendants' burden of establishing qualified immunity in future proceedings is great given the strength of plaintiff's First Amendment right
 
 
 [8]
 The actions against Ms. Snow were clearly cognizable as retaliation, just as was the dismissal of Dr. Ramirez. "Retaliation that takes the form of altered employment conditions instead of termination may nonetheless be an unconstitutional infringement of protected activity." Childers v. Independent School Dist. No. 1 of Bryan County, 676 F.2d 1338, 1342 (10th Cir.1982)
 
 
 [9]
 Even assuming we were to agree with the district court's conclusion that the complaint fails to allege facts showing a retaliatory motive, the court's dismissal based on qualified immunity would have to be reversed based on the court's failure to grant plaintiffs' request for leave to amend the complaint. Leave to amend their complaint was sought by plaintiffs in two submissions presented to the district court. See note 1, supra. Absent an apparent justification for refusing to grant leave, failure to do so constitutes an abuse of discretion and reversible error. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) ("the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules")
 Here, "[n]o reason appears in the record for denying leave to amend." Childers v. Independent School Dist. No. 1 of Bryan County, 676 F.2d 1338, 1343 (10th Cir.1982). Defendants had yet to answer the complaint against them; therefore, plaintiffs were entitled to amend the complaint as a matter of course, notwithstanding the absence of a formal motion and proposed amended complaint filed by plaintiffs. Triplett v. LeFlore County, 712 F.2d 444, 446-47 (10th Cir.1983); Stewart v. RCA Corp., 790 F.2d 624, 631 (7th Cir.1986); Nolen v. Fitzharris, 450 F.2d 958, 958-59 (9th Cir.1971); cf. Rules of the United States District Court for the Northern District of Oklahoma, Rule 15(C)(3) (no brief required in support of motion to amend pleadings). To the extent the cases cited by defendants prescribe a different rule, see Clayton v. White Hall School Dist., 778 F.2d 457, 460 (8th Cir.1985); Wolgin v. Simon, 722 F.2d 389, 394-95 (8th Cir.1983), they are at odds with the relevant precedent in this circuit and we must decline to follow them.